Number 4, 17-0333, Charles McKinney v. Hobart Brothers. And we have the appellant present by Mr. Reagan. Okay, good morning. And then we have the appellee present by Mr. Wilder. You may proceed, counsel. May I please report, Mr. Wilder? My name is Mike Reagan, and I represent the appellant at Hobart Brothers Company here this morning. This is a products liability case. The products are welding rods used in arc welding. Mr. McKinney never used Hobart's welding rods. He was a bystander who walked by three arc welders who he claims were using Hobart rods twice a day to take 15-minute work breaks on the same floor that they were working on for about eight months in 1962-63. Now, counsel, it's not disputed that the rods were used at the facility. Is that correct? That's correct. Okay. I just want to make sure. That's the state of the record. Mr. McKinney said he saw Hobart boxes, and that's what the record says. There is no testimony in this case that asbestos dust or even dust of any kind existed in this small welding shop. The plaintiff never said it. No coworker testified to it. That stark lack of testimony distinguishes this case. The statements in plaintiff's brief of circulating dust are inaccurate and cannot be relied upon by this court. The plaintiff wrote at page 32 that nothing stopped the asbestos dust generated on the mezzanine from drifting into and circulating through Chuck's work area, and that, quote, Chuck was exposed continuously to asbestos dust from Hobart's welding rods for almost eight months. There is not a word in the record about asbestos dust or that it circulated. The welding rods were in case. Counsel, I'm sorry. Let me stop you again. I just want to make sure I'm clear. So it's not disputed that they used these rods, and it's not disputed that the rods did contain asbestos, correct? That's correct. And is it disputed that when the rods, and I'm no welder, so feel free to educate me on that, but when you use them to weld, my understanding from going over this case is that a portion of it falls off. There are pieces that fall off in the welding process, and it's alleged that maybe some of them fell through this grate or whatever or fell down. So is it disputed, and I think it is, whether or not asbestos is released that can be inhaled through the manipulation of these rods during the welding process? That's completely disputed. So there are elements of what you said which are correct and supported by the record, but the fact that there was release or even potential for release is highly disputed in the case. Okay. Thank you. And I'm going to take that up now if I could. So the welding rods are encased in a ceramic-like thin layer of flux, and that flux is constructed by taking a small amount of asbestos, which constitutes a small percentage of 50% of the dry ingredients, and then the other part of the flux is a liquid silicate solution, and all of that is put in a mechanical mixer and mixed up heavily. And then it's extruded thinly onto the metal rod, and then that is passed through an oven three times at very high temperature and then dried, and that forms this ceramic-like coating. But more than simply that mechanical coating, the only evidence in this case is that there is a chemical bond, which is formed between the silicate and the asbestos, which encapsulates it and which is a very strong chemical bond, and there's no – that's our testimony from Dr. DuPont. There's nothing to dispute it. So with regard to that, I was trying to make sure that I understood. Dr. DuPont talked about how the asbestos in the flux would be melted by the process itself. Yes. So obviously there's going to be no asbestos dust from that. Correct. What about those pieces of rod that are either used up or aren't used completely? What happens when those pieces fall through the grating? And I understand that physically it wasn't as was contended that these were falling down where he was. He, in fact, was over on the other side. Correct. So when they're falling down, they're falling down to a different location. But was there testimony about fiber drift theory or any of that? There is no testimony about fiber drift in this case. Everything that you've talked about is correct. I mean, that's the general debate in the case. But there's no evidence of fiber drift, and the evidence is that even for those stub ends of what you're referring to, that that chemical bond, and this is a highly important concept in this case, that that chemical bond is very strong and prevents the release of free respirable asbestos fibers, which is what's necessary for the plate to have to recover. The parties agreed, touching upon the very first thing you said, the parties agreed that it was impossible for there to be any asbestos in the fume or in the gas from it because it's destroyed at a temperature much less than the arc welding temperature itself. So the plaintiff contends that either when the rods are removed from the container or when the stub ends are around, that in some manner they have potential for releasing it. But the only competent evidence in the record, and I stress competent, is what we just talked about a minute ago from Dr. DuPont saying that it is impossible for this material to release free respirable asbestos materials. So what the plaintiff points to are hearsay tests performed by people who did not testify, which never should have been brought to the jury's attention, let alone admittedly to evidence. And that evidence constitutes the most important and controlling issue in this case, and although there are many, many issues here, that's what I intend to spend my time on this morning. And time won't permit discussion of all of these trial issues, and so we rely upon our brief for the rest of it. First, and on this point, our first point is that Hobart should have been granted a JNOV because there is a total failure of proof on the question of whether the rods could release respirable asbestos fibers and a failure of proof on any exposure of plaintiff to asbestos. And that's a threshold legal requirement that those things be shown. Hobart offered detailed proof of this chemical bonding and the resulting impossibility of fiber release. Plaintiff made two ineffective, improper attempts at showing there was a release of fibers. The first and primary attempt by the plaintiff was to essentially read the results of hearsay reports made by people who never testified. The plaintiff opened the trial by calling Tim Hensley, who was the corporate representative of Hobart, to the stand, and then plaintiff then asked him about a wide range of topics. I respectfully suggest to the court that the best way to gain insight into the unfairness of this trial, the erroneous rulings made on objections to evidence, the prejudicial effects of those rulings, how this trial went off the proper rails, is to read the testimony of Mr. Hensley. It is dramatic. Plaintiff's counsel was permitted to use the supposed adverse examination of Mr. Hensley. They call him under what? Section 16. I have not kept track of all the numbers. A high school graduate to read and to have him read inadmissible results of expert tests, which plaintiff had no intention of having anybody later testify to. This was done under the guise of impeachment of a witness who could not have testified as an expert and about something which the witness denied was authoritative or reviewed by him informing his own testimony. Had Mr. Hensley been identified as an expert? He had not. He was identified as a lay witness at C7072, and there is a sentence in there that says that it's possible that some of his testimony may be regarded as falling within the areas of both lay and expert witnesses. Accordingly, should the court find that this testimony involves matters the court deems to be expert testimony, defendant reserves the right to elicit such testimony. So there was that precautionary disclosure, but he was never qualified as an expert,  Was he not intended as a state-of-the-art witness? Just as to the facts. Counsel, just to follow up, in the discovery you just referenced, does it indicate what opinions potentially would be disclosed in potentially expert opinion? It does. Again, this all commences at C7072. Hensley did not have any expertise to competently express an opinion as to the authoritative quality of the test that he was being questioned about. He did not know how the tests were conducted. He testified that the tests were neither peer-reviewed nor published, and despite being essentially badgered, he refused to say that the tests were valid. Plaintiff attempts to justify the use of this test not only as impeachment, but saying that they are entitled to cross-examine an expert using hearsay tests pursuant to the Supreme Court's opinion in Leonardi v. Loyola and the prior appellate court opinion in Piano v. Davidson. But those cases plainly say that an expert may be crossed about facts that he reviewed informing his opinions, but neither of those conditions is present here. The circuit court's initial error in permitting these tests to be read to the jury by counsel in forcing Mr. Hensley to read them was made worse, with respect, by her subsequent ruling in admitting these tests, the competent tests, into evidence. Once Hobart's objections to what Hensley was forced to testify to were persistently overruled, then on direct or clarifying questioning, counsel for Hobart did what he obviously had to do, which was to question Hensley about what the plaintiff had just questioned him about. In doing that, he did what is routinely done in trials, which is to have portions of reports projected on the ELMO so that he could discuss them with the witness. Thereafter, still during Hensley's testimony, the plaintiff moved for admission of those reports, and that was granted by the court, noting only that she had overruled the objections to the reports before, but without saying anything else. And that, too, was error. The opponent of evidence has the right to defend himself, itself, and discuss evidence once its objection is denied. We cited APA, A-P-A, in our reply brief at that point. You know, that's clearly the law. There's no doubt about that. Hobart's counsel didn't do anything qualitatively different than what Plaintiff's counsel had done. So the Plaintiff's counsel had read sections of the report to Mr. Hensley and said, doesn't it say that? Yes, it does. And he had forced Mr. Hensley to also read parts of the report himself. All that the defense counsel did in his examination was to do what he was doing with all the witnesses, which was to show parts of the report up on the ELMO as he talked about the evidence. There is no functional difference between the plaintiff reading it and the defendant putting it on the screen. And yet the basis for the trial court's admission was plaintiffs saying that Hobart had, quote, And then the plaintiff was given permission to immediately give to the jury for inclusion in their evidence folders, copies of the entire reports. And then in closing, plaintiff said that those reports were evidence of the release of asbestos and used them, pointed to them and said, that proves that what Hobart has told you is, quote, not true. Plaintiff says that we didn't object to that during closing argument. We didn't. We didn't have to. Our complaint is, first of all, that they were ever discussed through Hensley. And secondly, that they were admitted into evidence. And the fact that they were talked about in closing argument was merely the cherry on top of the plaintiff's someday being able to take great advantage of these tests. Counsel, am I remembering correctly that initially when these studies were brought up with Hensley, the representation to the court was that this won't be going back to the jury? That's my understanding, yes. Yeah. I didn't mean to say yes. Yes, sure. It's true. So neither of these two justifications for this serious error have any legal support. The argument for permitting the discussion of the reports at all was that, quote, he's the corporate representative. And the argument for why the hearsay objection was overruled so that the test were admitted was essentially what that, quote, they put it on the envelope. And so what we apparently have here is yet another exception to the hearsay rule, which is that they put it on the envelope. So this error has two consequences in the fabric of this case. The first is that because those hearsay reports do not constitute evidence of fiber release, Hobart should have been granted, and we respectfully request here, should have been granted a JMOV. But at a minimum, there should be a new trial because this is a very, very serious trial error evidentiary. Hobart's only other attempt to demonstrate fiber release and thus exposure to asbestos was through Dr. Frank, who is their medical doctor. He is a medical doctor. He makes his living talking about asbestos, but he has no technical training or qualifications other than as a physician, plus he has another degree, which I haven't written down, a public health degree or something like that. But he never tested welding rods. He's unaware of any epidemiological studies which relate to welders, let alone bystanders being at risk from asbestos fibers from the handling of rods. What he said was, when asked whether these rods can emit fibers, he said, I have never seen, quote, unquote, and I have, quote, never met a product containing asbestos, which didn't have the potential of releasing asbestos fibers. And that's it. Why did that not go to the weight to be given that testimony as opposed to its admissibility? A number of reasons. First of all, he stated no reasons, and experts' opinions are only as good as the reasons and are not to be given weight or even admitted if there's no reason stated. Secondly, this was not – he didn't talk about any methodology as to how this was arrived at, and that's a reason it should not have been admitted. And he didn't – and it wasn't properly disclosed, which was the next point that we're making. But responsive back to your question, Justice Durham, is that in the absence of a methodology, in the absence of showing of his qualifications to offer such an opinion, that it is simply inadmissible. The single sentence of disclosure that the plaintiff justifies here for saying we were entitled to have Dr. Frank say was this. This is it. Dr. Frank will testify that Charles McKinney's mesothelioma was caused by his exposures to asbestos, including exposures to asbestos from the products of all defendants, period, end quote, and that's the extent of the disclosure. And plaintiff argues that all of Dr. Frank's testimony was therefore encapsulated, if you will, within that because it necessarily meant that welding rods can give off asbestos fibers, et cetera. Well, counsel, I guess the question becomes if they disclose that they were going to assert that their client was exposed to asbestos through your products, isn't it logical that they must be saying that your products did emit asbestos? That is their point, Your Honor, and certainly that's not, I mean, it's a possible interpretation. But you knew all this in the context of what this gentleman's prior work history was. I mean, we know he worked, you know, in the auto industry, and we know he worked at the Hobart facility for eight months or so. So I'm not so sure that I'm really, maybe I shouldn't say following him, or agreeing with your position that we had no idea this was coming. Well, I would just say this, that in the current world of requisite disclosures, that I don't think that matches up. But obviously I accept what you're saying, and I now need to keep going. But there's a related unfairness. If you want to say, and I don't mean that you, but I mean if the argument here is, okay, well, that's good enough. There was a great unfairness, a disparity of treatment in how the trial judge then treated Hobart, because she engaged in this very liberal and expansive treatment of that single sentence of disclosure. And yet when Hobart sought to have its expert, Dr. DuPont, testify as to why he believed that these hearsay tests were, quote, invalid, which is what he told plaintiff's counsel in his deposition. He said they're invalid. And the plaintiff's counsel did not ask any follow-up questions as to why that was invalid. Then the court said, well, the reasons weren't disclosed, and therefore we're not going to allow you to testify to it. So if there's going to be, you know, if there's going to be a liberal interpretation on the one hand, then here in fairness and in justice, really, there should have been a complaint. So are you saying that if the trial court had also afforded you all that liberal interpretation, your position may be different regarding the interpretation the trial court afforded with respect to those studies? Well, we had better disclosure than they did. They didn't say anything about coming out of the rods, and we said tests were invalid. We think that we had a more specific disclosure, but I understand the court's points. You didn't answer my question. Oh, well, I'm sorry. My question was if the trial court had afforded you all that liberal interpretation of the discovery rules, as you termed it, that she did for the other side, would you still take the position that the liberal interpretation was inappropriate for the other side? I do, and I was trying to answer your question, which was I think that there's a difference in quality of the two disclosures. I mean, certainly an equally liberal interpretation would have gone a long way towards removing some of the prejudice. Thank you. I want to make sure I understand, because I took your primary position to be that the disclosure was not appropriate. Right. So that, in and of itself, should lead to a particular result. Right. Okay. That is our primary position, absolutely. If the court can tolerate me saying that I want to talk about an evidence issue, another evidence issue, and also to your instructions very quickly, the plaintiff here was not required, and this gets into the instructions issue as well, was not required. It was permitted to introduce evidence of state-of-the-art co-mart knowledge, et cetera, long after these rides were sold and manufactured, and that's an evidence point. On the instructions, the jury should have been instructed as Hobart tendered instructions that Hobart. Excuse me, counsel. I'm sorry. You are actually out of time, but you will have additional time on rebuttal. Okay. And I'll say that as rebuttal, I want to talk about those two things. Thank you. Thank you. Thank you. Mr. Wilder. Jim Wilder, representing Chuck McKinney, asking you to affirm the verdict. Since it sounds like he's going to talk about the instructions on rebuttal, I'm going to spend one minute here since I don't get to serve rebuttal. The instructions they complain about primarily are their failure to give special interrogatories. They say the statute, 21108, says you can give more than one question. You can. And I've even had cases where two or three special interrogatories went back, each of which was signed. I've never had a case where there was a string of seven, which they didn't put in their brief, but urge you to look at them, where it says, if you answer question one, proceed to question two. If you answer question one, no, your deliberations are complete, and it goes like that. And then at seven, if you have answered all seven of them, yes, then you use verdict 4A. That's why we have 4503. The special interrogatories I've seen is just a question. In fact, you're not even supposed to tell the jury how to answer in order to reach a result. You're supposed to test the verdict. They also complain about 3021 being given, aggravation. Chuck had COPD. He had shortness of breath. And I suspect Mr. Regula will say, and he also had claudication of the veins. That's how they found the measles. And so I think Mr. Regula will say, well, that doesn't show that he caused the measles or vice versa. Well, no, the injury is more than just cancer. When you get cancer, you get the effects of cancer. And if you've got COPD and you put a lung cancer, measles, flue, the lung, measles, flue, the ulma on top of it, then there's an aggravation of both, if you will, because it's shortness of breath. If I break my arm, it's not just I broke my arm. It's the pain, suffering, or whatever, if there is one, associated with the injury. They may talk about obstruction 15. You can look at it. It's not an IPI. I didn't use this term. It's not for IPI. There are 15 that was refused. Now going to some of the questions that came up, I guess starting, there was a question, was there anything about asbestos fibers traveling? From Justice DeArmond, if you look at Dr. Frank's deposition at page 45, he talks about how they can travel up to 300 miles once they're released, how they can be reentrained. That's at page, I believe, 48, 47. He talks about neighborhood disease a half mile away, so he talked about the ability to respirate. There was evidence in the case about the ability of respirable asbestos fibers to travel. Well, let me follow up with a question then. Can you point to any factual testimony, any evidence that the dirt in the room was asbestos, that there was some evidence that the fibers were in the room? For instance, there was no testimony that clouds of dust were seen, things of that nature. What can you point to that shows this sort of friable material in the air? First, that's one point I wanted to make. This quote, ceramic, was more like a friable material, the flux that was left on the stubs after the rod had been used. In terms of clouds of dust, there isn't any evidence. But, again, Dr. Frank testified, and he's the only doctor, other than a treater, who supported his testimony. I agree with Dr. Frank. He's the only doctor who testified in this case. The defense called no doctor, even though they'd said they were going to clear up until the night, made the tactical decision not to call their state-of-the-art expert. You can't see respirable asbestos fibers. Dr. Frank talks about that at page 48 of his deposition, where he says that you can't see the individual fibers. Maybe if there was a ton of them, you could see a haze between me and the sunlit window, but otherwise you can't see them. He also testified and gave his opinion that fibers are released when they're manipulated, when they're braided, when they're crushed. And those fibers will circulate, to go to Justice Holder White's question, because here we had the grading, and Chuck didn't work directly under the grading. It was sort of like over a ways. He went up the open stairwell, which is a wood, this is 62, so I mean it's just a stairwell. It's not unfair to call it a stairwell, Chuck said that. It's a wooden stairway with one railing open up to the third floor. There's no door in the break room, so this isn't just a guy walking by for 10 seconds. And it was brought out actually by Hobart's counsel that there were fans up, the third floor is the top floor, fans.  It was cooler. There was no fan in the break room, Chuck said, but there were fans up above the welders. To follow up on Justice Kavanaugh's question, what Dr. Frank talks about in general is one thing. What evidence is there in specific that these conditions existed with regard to asbestos fibers at this particular facility? If I could kind of piggyback on that, it seems the real issue is whether or not the fibers were released. It's well known, understood, they can travel, you know, that type of thing, but were they released in this instance? That's Dr. Frank's opinion that it was, and that's based on his training and his experience of 47 time in trial, 47 years of publishing and doing research and similar things. There's no literature on welding rods that's been published. Welding rods one way or the other. There were 3,000, 4,000 products. Now, to go directly, there isn't anybody that says there were clouds of dust. We have an opinion from an expert, qualified expert, that says they will release them when they're abraded. They will release them when you walk on them and they're crushed. We have the testimony that just like every other welding place, they threw the stubs at the stub bucket, and some hit, some didn't, and some fell down to the second floor, and Chuck walked by and probably walked on some of them himself as he walked along on the pathway to the break room. So we have that testimony, but in terms of saying, I saw fibers which are too small to be seen released, no. We don't have that here, and we rarely have that, unless it's a really filthy facility like an asbestos factory where you could have clouds of asbestos. But otherwise, because the testimony, again, from Dr. Frank, and we're referencing the literature, is asbestos will travel, and in fact, I left that out, Justice Garman. I should have mentioned that. One of the exhibits at his deposition was an article from 1964 by Celikoff that says everybody on a construction site is at risk because once the insulators or somebody releases it, it will go everywhere. Even the chief architect is at risk if he visits the website, I mean the job site, is at risk. But there is nobody who says, I saw these invisible fibers. Instead, you have the testimony of an expert who says, given how they were used, and in fact, in his answer to the hypothetical that was specific to Chuck's use, I mean Chuck's work, he said, given my prior experience with them and knowing that fibers are released from their usage from the stubs, not from the burning, it's burned up, but the stubs, that there would be fiber release here given these circumstances. And it is the unused rods. I'm not a welder either, I'm a city kid, not a welder, but I mean the unused rods, it's a 14-inch rod, 17-inch or 18-inch rod, all but the last inch has got this flux on it. When you're welding, you don't get down to the part that has no flux, so every stub has some, and if you finish the weld, if I'm welding this and I finish it, I have finished, I need another rod, but I only used two inches in the next rod, I can throw that one away and start anew or use half of it. So the stubs aren't necessarily an inch long. I wanted to address Dr. Frank for a moment. I agree, Justice Yarman, his qualifications, and he has a Ph.D. as his other degree in biomedical sciences. As far as him making a living testifying, he is unique in his business litigation. He's been testifying for 40 years and he's never taken a dollar. All the money he charges goes to the universities he has worked for so that they can have a better department. The defendants go, and it was in this evidence, Step 2, using a legal phrase, sort of blows their mind that this is an expert who is not taking any of the money, and they've searched for years. He doesn't take it. He gives it to the universities, says, I make enough as a head of the occupational medicine department. And if you do occupational medicine, which is hazards and risk of employment, that's familiarity with the concepts of release of fibers and so on. As far as Honeybart, Hobart, knowing it was coming, as you asked Justice Holder why, yeah, they knew it was coming. I mean, we disclosed, I mean, you don't get asbestos disease from anything other than inhalation of fibers that are in the air. Nobody suggested Chuck got measles or was going to suggest he got measles from being beat on the head of the stubs or something. And so when you say he's going to say it came from your products, and the complaint that we filed against him had as attachment A, the products at issue, which was asbestos-containing welding rods, it is logical to say, well, this guy's going to say there's fibers from these. And they were. So as long as he's going to testify that, in his opinion, asbestos can come from welding rods, it doesn't matter that he knows nothing about the physical makeup of the welding rod or how it could possibly cause the asbestos to be separated from it, and says he has no experience with it, he's never done any testing. I think he has familiarity with them from prior testimony and from prior questioning. He knows it's not in fumes. As far as the formula and percentages, he doesn't know about that, Judge. Or the mechanics of how it happened. Well, the mechanics is how his testimony is. If you manipulate an asbestos-containing product, if you manipulate it, whether you cut it, bevel it, brush it, abrade it, these rods were cut or beveled, he is, in his experience, it will release fibers. He doesn't know about the chemistry of it. That's true. And the bond, he said, I don't know anything about a bonding issue with it. He doesn't know that. But he gave his opinion. The jury could have disregarded it. The jury could have found it persuasive. DuPont, their expert, had never done anything with asbestos until he got hired by the welding companies in 08. He testifies about the chemical bond, but he's never actually done any. He had never done any. He said he didn't need to test and see if, in fact, the chemical bond that he said would work or if they were thoroughly mixed or not mixed. In other words, whether it was all together. He had never done any of that. He just said, well, pure chemistry that's, I think, sort of unique and magic, not magical, unique bonding thing here, that somehow it gets mixed up and just all bonds together and you can't release it. But he had just accepted that because he says, and nobody else had ever tested welding rods for that premise. So the jury was given two different versions there, and I suggest it was for the jury to decide who they found more persuasive. And Honeywell knew, Hobart knew it was coming. And we offered him, after Hobart was in the case, Dr. Frank had already given a deposition where he had these same general principles, not about Hobart rods, but about the defendants who'd been in an earlier case. We said you can get a copy of the deposition if you want it. They clearly got it from someone because they used it as evidence, and I told them, I'll give you another deposition. And the response was, why? We already know what he's going to say. And so they took no deposition, which I think is a little different than Dr. DuPont, turning to that and all these charges that the judge was unfair. They did not disclose anything with DuPont about the confidant or the mental reports. He was asked at his deposition, are you familiar with these? He said, yeah, they're invalid. And we moved on. That was at his deposition. They never disclosed the basics for him, for his why they were invalid, and he did, he was allowed to give his opinion to the jury.  It wasn't your obligation to follow up with another question? Why do you think they're invalid? I don't think so. Under the case laws that shook out, it's different than when I was practicing 30 years ago. But now, he's a 213 F3 witness, and he said it was invalid. I mean, depths have changed now. When my expert's being deposed, I'll add areas, or when I'm deposing a defense expert. Lots of times they'll say, doctor, let me ask you about this, because they know it's not in their written disclosure, and they want to make sure it's disclosed at the time of the trial, or by trial. People follow up with other areas. So it's a little different than it used to be, and I think the case law supports that you don't have to, it's not the duty of the opponent to go into what the bases are for the opinion. But that becomes the duty of defense counsel to inquire, and should not, in all fairness, make it substantial evidence, because he is crossed on a point that wasn't flushed out, if you play that argument out. Right. If I follow what you said, if you ask somebody, and they give an opinion on an area like here, they're invalid. Then when the exam is finished at the depth, the other side says, well, you said they're invalid, doctor. Tell us why you think they're invalid. And then that's out there, the bases for that, for this new opinion that wasn't in the disclosure. And you were allowed to use it as substantive evidence. Not just impeachment. Right. You impeached him appropriately, but then you got to use as substantive evidence those reports. That was with Hensley, Judge, and that's where I'm headed next, which is Hensley, they said Hensley's a lay witness, but Mr. Reagan was honest in his reading to you. Well, he's a lay witness, but he may give opinions as this lay witness. And Hensley was called as an adverse witness under 21102, and Hensley was asked about these because he had, he was familiar with them, because he had been supplied them by counsel, trial counsel, supplied them by trial counsel during his years as being the corporate rep. So my partner, Mr. Kelly, asked him about, you're familiar with those, right, because Hensley was saying they don't give off fibers and it's impossible to give off fibers. And Mr. Kelly asked him, well, you're familiar with the reports, and yes, you're familiar with them because counsel has supplied you with them. That made it fair game, we said, to ask him about these things he was familiar with, which were contrary to what he just said about it couldn't give off fibers. The judge said, you know, these aren't going to be published to the jury. You can ask him about them, but we're not going to publish them to the jury. I think it was the attorney that told, that assured the judge. Yeah, Mr. Kelly said it won't go to the jury because it was hearsay. You don't want people asking a question, we're not going to, you know, publish them to the jury. There were two ways things were published in this case. For Hobart, it was the ELMO or PowerPoints. For us, it was handing out an exhibit and each juror getting their copy to look at and follow along, which is a procedure we've used in Bloomington since 81 when the trial judge, a young individual named James Connex, suggested that it would make things go easier if everybody had their own copy of the exhibit. That was sort of pre-PowerPoints back in 81, so that's how it's done. And they're both fine, but after the discussion that they're not going to get published, Andy sits down and Mr. Scheffler gets up and he uses pages 1, 5, 6, 9, some of the graphs, spectral graphs, and is asking about all of this just right up there in the courtroom. So when he finishes, that's when Mr. Kelly said, well, he just published them. I want to have them admitted so I can publish them. And if you look at the examination, the recross by Mr. Kelly, all he did was follow up on the stuff that Hobart had just put up in front of the jury. That's all he did at that time was put up in front of the jury and said, look at this spectral graph of this lay witness and look at this spectral graph. How do they differ from these two substances? And the judge said, yeah, I'm going to admit them. We published them. There was no request at the time she made that ruling for a limiting instruction saying, these aren't substantive evidence. They're only to be considered by you in assistance of the expert. They didn't ask for that. And they don't complain about Mr. Kelly's exam because it followed and tracked completely what Hobart had just done in terms of going to the same pages of the report, in his recross. They complain about what Mr. Kelly said in closing, but they didn't object. They complain here, but they didn't object at the time of closing to that. So I don't know how they can preserve that error. I don't think it was error, but if they were going to preserve it, they should have objected during closing. So that's how we got to the Compton situation. We agreed at the start it shouldn't be published. You don't typically publish a medical article, even if it's peer-reviewed, under Costa, Rochevy, Springfield Clinic. But you ask about it, but you don't put it up on the ELMO or on the PowerPoint and say, look at this graph here and so on. So that's where this idea that it's something new about, here's the exception due to the ELMO is a cute way to say it, but that's not really what occurred here. It's because they published it knowing that the parties had just agreed with the judge, this won't get published. We'll ask him about it since he's familiar with it. It won't be published. Next thing you knew, it was up on the big screen. One thing that he briefly addressed was the post-62 acts. In their initial brief, they said there were four, as Chuck worked in 62, four things that were wrong. We pointed out three of the four things. He didn't object to them, so he can't, you know. The fourth one about the training and education of their employees, they did object to. And they said, well, this is, you know, this is, we said it was, it went in because it was contrary to Hobart's position. And in their reply brief, they say, well, this is unique and novel because, unique and novel because it's evidence that didn't go in. They told the judge they were bringing Dr. Berger. I referenced Dr. Berger in opening. They're an expert who says Chrysotile won't hurt you, basically. That's a paraphrase. They referenced Dr. Berger in opening. They said all the way to the night before he was supposed to testify, Dr. Berger was coming. Knowing Berger was coming, their state-of-the-art and medical doctor, who was going to say Chrysotile won't hurt you, it was inconsistent with that position that they educated and trained their workers who were only working with Chrysotile about diseases back in, probably in the 70s. So that's why it was inconsistent. They made a tactical decision not to call Dr. Berger. I'm not sure why, but I think it's because they decided it would be better to say, well, Chuck was exposed to brakes for 40 years, and brakes are all Chrysotile. So it would be sort of odd for them to be able to blame the brakes if their last witness had been their expert and said Chrysotile can't hurt you. And I think they thought we're better off seeing he's exposed to brakes, and that's really what caused it. I'm asking you to affirm the verdict. I don't take any questions. But this was a lot of charges about the unfairness of the judge with all respect to Mr. Reagan and more respect to the judge. She read everything at the time she went back and thought about it, and I think she did not abuse her discretion. It was a fair trial. This isn't a Nolan situation. They brought in all the other exposures. There's no question as to damages. And on frequency, regularity, and proximity, in case he goes there, Thacker and Waymeier, this Court says. I'm sorry, Mr. Corwin. You're out of time. Thank you. Thank you. Did you say Mr. Corwin? I'm sorry. Yes, I did. Mr. Wilder. Thank you. Okay. Mr. Reagan. Thank you. Taking up first the question that Justice DeArmond asked and Justice Holder-White piggybacked onto is what evidence is there of release in this facility, in this case, and the answer is none. There's zero evidence of any kind of release in this facility, and there is zero evidence of any release above the background level, which is part of the usual discussion in asbestos cases. The only evidence here of any potential for release is Dr. Frank, the medical doctor with a PhD in something else, who said that he has, quote, never seen and, quote, never met anything containing asbestos which wasn't capable of releasing fibers. Let me ask. I'm going to follow up on that. Please do. Counsel seemed to put that into perspective. There was no testing on the rods at that time or up until that point. Therefore, while troubled by the statement, it's like trying to prove a negative that because all products can't be contained, this product couldn't be contained. But I think some light was drawn on this in that there were no testing, so the response during testimony was, well, look, no products contain the fibers, and we don't have the testing, and that's why the statement came out. So can you speak to that? Because I believe that's the reason that the answer was made in the way it was made, in that there wasn't testing. Therefore, he couldn't speak specifically to the testing of the rods, but instead talks generally about his 40-some years of knowledge about products.  But it still is really the only reason that he's offered for knowing that there might be a release here. So I think my reading of the record is the same as yours, except, well, not except, but it comes down to the point that when pressed is, well, how do you know? And his only answer was, I've never seen and I've never met. As to Hensley, the justification for forcing Mr. Hensley to talk about these reports is that they were, quote, supplied to him by counsel. Now, that doesn't make him an expert. It doesn't make him as having expressed expert opinions in this case. And if your attorney shows you something, no matter what it is, that doesn't mean that that becomes, then, fair game for the process of elimination. The court has a busy morning. I'll be efficient with your time. My friend, Mr. Wilder's first guess as to the topic of instructions I was going to take off was wrong. But the two instructions I do want to talk about are, first of all, the instruction number 15, Hobart's proposed instruction number 15, which was rejected in that, which requires that the jury be instructed as to Hobart's knowledge at the time of sale, as the only thing it has to warn about. This is a negligence case because of the statute of repose. So all the theories you hear are negligence. The widow versus Park Davis from the Supreme Court said that the plaintiff must allege and prove that the defendant knew or should have known of the danger, allege and prove. Courac versus American District Telegraph says that the knowledge element was properly included in the jury instruction. And Solis versus BASF said that on remand, the court should provide a similar instruction with regard to the negligence failure to warn, explaining that BASF only had a duty to disclose scientific information that it knew or should have known. There's simply no doubt that that should have been in the instructions. It wasn't, and it goes to the very heart of this case. Lastly, on the aggravation of preexisting injury, there's no evidence. You don't get that. I mean, Mr. Wilder basically said, well, look, cancer affected a lot of his life or something. But you don't get the instruction on aggravation of a preexisting condition unless there's evidence to support it, and there simply was none. This was a general verdict in this case. It was not the report components, and therefore you can't segregate that out to a particular element of damages. I thank the court. Thank you. Thank you very much, Mr. Reagan and Mr. Wilder. We'll take this matter under advisement and be in recess until the next case.